DOLLY MAY GIFFROW BAKER et al., appellants, v. LESLIE GIFFROW, a/k/a LESLIE CORSSWHITE, et al., appellees.

## No. 51715.

(Reported in 135 N.W.2d 629)

June 8, 1965.

Virgil O. DeWitt of Pizey, Sears & DeWitt and A. C. Hatt, all of Sioux City, for appellants.

Crary & Huff, of Sioux City, and Roseberry & Down, of Le Mars, for appellees.

MOORE, J.—This is a partition action filed August 13, 1963, to determine the ownership of 160 acres of farmland in Plymouth County. The contending parties all claim ownership under the will of Amanda Giffrow which was duly executed November 23, 1928. It gave her son a life estate in the land with remainder to his children.

Trial to the court resulted in a decree and judgment that plaintiffs, his adopted children and successors in interest, had no interest in the real estate. Defendants are the natural children of the son, Ernest Giffrow. Plaintiffs have appealed.

For brevity and clarity we refer to plaintiffs as the adopted children of Ernest Giffrow although John Baker is the son and successor in interest of Helen Giffrow Baker one of the adopted children. She predeceased Ernest.

Amanda Giffrow died March 20, 1935. Her will dated November 23, 1928, was admitted to probate on April 19, 1935. Following several annual reports the estate was closed by order approving the final report on February 27, 1942.

The first paragraph of Amanda Giffrow's will directs sale of a seven and one-half-acre tract in Le Mars and the use of the

proceeds. The second paragraph devises a certain described quarter section of land in Plymouth County to her son Richard Giffrow for life with remainder in equal shares to his children and provides if any of his children be deceased leaving issue such issue would take their deceased parent's share. Paragraph three devises to her daughter Alice Pasley for life a certain described quarter section of land with remainder to her children or their survivors. Paragraph four devises another described quarter section in Plymouth County to her daughter Lizzie Raveling for life with remainder to Ernest Giffrow, Alice Pasley and Richard Giffrow.

The fifth paragraph of Amanda Giffrow's will, as pertinent here, provides: "FIFTH: Subject to all of the provisions made in this Will I hereby will, devise and bequeath to Ernest Giffrow for, and during the period of his natural lifetime only, the [quarter section involved here] and upon the death of said Ernest Giffrow the same to go to his children share and share alike with the expressed provision that the child of Ernest Giffrow, issue of himself and first wife, shall be recognized as one of his children and entitled to a share as such; that if any of said children be deceased without leaving issue their share shall go to their own brothers and sisters, but if they leave issue such share shall go to said issue. * * *."

Paragraph six devises to a granddaughter, Amanda Matters, daughter of her deceased daughter, Ida Giffrow, a described 80-acre tract in Plymouth County.

The provisions of paragraphs seven, eight, nine and ten are not material to any of the issues here involved.

Much of the record is by stipulation. This includes admission of the entire probate record of the Amanda Giffrow estate, her husband's death prior to the making of the will and Ernest Giffrow's death on June 17, 1963.

Exhibit 1 was admitted by stipulation. It is a copy of Articles of Adoption whereby Ernest Giffrow and Bertha Giffrow, husband and wife, adopted Dolly May Pasley, Frank William Pasley and Helen Ruth Pasley, on May 31, 1927. It was duly recorded in the office of the county recorder of Plymouth County on that same date.

Defendants' answer, among other matters, pleads the adoption, about 18 months before the execution of the will, was not known by Amanda Giffrow at anytime. They assert she did not intend plaintiffs should take under paragraph five of the will. They point out plaintiffs as natural children of Alice Pasley take only under paragraph three.

The question thus presented is not one of an adopted child's right to inherit but simply a question of the testatrix' intention with respect to those who are to share in her estate.

■ I. Volume 2 Am. Jur.2d, Adoption, section 96, pages 936, 937, states: "It is the disposition of the courts to confine and limit the application of the word 'child' or 'children' when used in a will or in a trust to designate objects of the testator's bounty as excluding adopted children of persons designated in the instrument, unless the context of the instrument indicates his intention to include adopted children, or intention to use the term in a more extensive sense than its natural import, or such intention is to be inferred from the attendant circumstances, or such a construction is required by statutory definition. The word 'children' does not usually include an adopted child, notwithstanding a statutory provision investing an adopted child with the right of inheritance from the adopting parent, unless it is manifest from the instrument and the surrounding circumstances that inclusion of adopted children was intended. * * * It is generally held an adopted child is not entitled to property conveyed or devised to 'the children' of the adoptive parent, unless a contrary intent is disclosed by additional language or circumstances. This is especially true where the adoption took place after the death of the testator or was for other reasons unknown to him, * * *."

See also 57 Am. Jur., Wills, section 1365; Annotation, 86 A. L. R.2d 12, section 13, page 48.

Restatement, Property, section 287, page 1520, expresses the rule:

"(1) When a limitation is in favor of the 'children' of a designated person, all persons adopted by the designated person are excluded from the possible takers thereunder except when a contrary intent of the conveyor is found from additional language or circumstances.

"(2) The following are the most frequently encountered factors tending to establish the existence of the 'contrary intent of the conveyor', referred to in Subsection (1):

"(a) the conveyor is also the designated person;

"(b) the conveyor at the time of the execution of the instrument containing the limitation knows of the adoption."

The comment on subsection (2), clause (b), on page 1524 is:

"Situations which include the factor described in Clause (b). When a conveyor limits property in favor of his own 'children' and has theretofore adopted a child, the situation thus created is within both Clause (a) and Clause (b). When, however, a conveyor limits property in favor of the 'children' of a person other than himself and such person has theretofore adopted a child, the situation is not within Clause (a) but is within Clause (b), if the conveyor knows of the adoption at the time of the execution of his conveyance. When these facts exist, a finding is justified that the conveyor intended such adopted child to share to the same extent as if he had been a natural born child of the designated person, and this finding is made unless additional language or circumstances tend to establish a contrary intent."

The parties here do not dispute these general rules. In Cook v. Underwood, 209 Iowa 641, 645, 228 N.W. 629, 631, we say: "More emphatically, the word 'heir' is not construed to include an adopted child of the beneficiary's, where the word is used in the sense of child, or where the specific term 'child' is used, or heirs of the blood are in contemplation. Warden v. Overman, 155 Iowa 1. *Particularly, the word 'child' does not ordinarily include an adopted child.*" (Emphasis added.) We do not repeat the long list of authorities from other jurisdictions which are there cited.

All parties here rely strongly on Mesecher v. Leir, 241 Iowa 818, 43 N.W.2d 149. There the testator devised a portion of his estate to " 'such children of my aunt * * * as may be living at the date of my death'." We recognized the general rule but in construing the intention of the testator we held an adopted child of the aunt shared equally with the aunt's two natural children. The facts show the adoption took place 37 years before

the execution of the will. There was evidence testator knew of the adoption for practically all of this period and that it had met with his approbation. We held the evidence brought the case within the exception to the general rule and established testator intended the adopted child should be included.

At page 826, 241 Iowa, page 153, 43 N.W.2d, we say: "We are satisfied that a principal requirement for the adopted child to be considered under the term 'children' is that the adoption was completed before the execution of the will, and second, the testator knew of the adoption. Conditions may vary with the different cases and circumstances may add to or take away from this requirement, but it is sufficient when it appears in the facts, and will authorize the court to consider under the term 'children' an adopted child as distributee."

Plaintiff-appellants agree in argument they have the burden of establishing facts to bring them under the exception to the general rule. They concede unless Amanda Giffrow knew of the adoption they cannot prevail. Thus we are brought to a careful study and consideration of the record.

Paragraph 6 of the trial court's findings is:

"That from time to time after May 31, 1927, and before November 23, 1928, Amanda Giffrow did visit the home of her son Ernest and knew that the three children of her daughter Alice were making their home with him and his wife. Until the time of her death in 1935 she spent considerable time in this home but she never was informed of their adoption; and it is hereby made a finding of fact that Amanda Giffrow never did know that they had in fact been adopted by Ernest and Bertha Giffrow, either before or after the execution of her Will.

"It is true that there has been testimony indicating that she had such knowledge, but of such doubtful authenticity as to fail to establish that contention by a preponderance of the evidence, which leads to the finding of fact above made."

II. This is an equity action and is triable de novo here. We are not bound by the trial court's findings but when considering the credibility of witnesses we give weight to them. Citation of authority is unnecessary. See Rule of Civil Procedure 344(f)7.

Dolly May Giffrow, Frank William Giffrow and Helen Giffrow were respectively 12, 11 and 8 years of age at the time they were adopted by Ernest Giffrow and his wife, Bertha. Their mother, Alice Pasley, a widow, was Ernest Giffrow's sister. She was unable to care for them and they were going to be taken from her by the Sioux City juvenile court officials. On May 31, 1927, Alice Pasley, Ernest and Bertha Giffrow went to Le Mars, a distance of 17 miles from the farm home of Ernest where the three children were then staying. After consulting attorney Clarence Roseberry the adoption was made. They then returned to the farm. From this point the evidence is in sharp dispute.

Dolly May Giffrow Baker testified that her grandmother, Amanda Giffrow, was with her mother, uncle and aunt when they returned from Le Mars. She testified: "My Uncle Ernie said: 'You won't have to worry anymore about them people coming here' he says, 'You are my kids now.' He says, 'I have adopted you. I am your father now'. My mother said: 'You are not my kids anymore; you are Ernie's kids. He is your father now.' That was in the presence of my grandmother."

She also testified she overheard a conversation in the presence of her grandmother when Ernest said: " 'This is one of the children I adopted. They were Alice's children, but they are mine now. I adopted them. I am their father'." Also that she heard her grandmother (Amanda) tell her brother Frank to mind Ernest and that he was his dad.

Frank Giffrow testified he went to live at his uncle's home at age six. Dolly came two or three years later and was followed by Helen. His testimony regarding the conversation upon the return from Le Mars the day of the adoption is substantially the same as that of his sister Dolly. He testified he recollected his grandmother (Amanda) telling Dolly to mind Ernest and Bertha because they were now her parents.

Richard Kelly testified he worked for Ernest Giffrow for seven and a half years starting in 1925 and that he had heard Amanda Giffrow tell Dolly, Frank and Helen " 'You want to be good because Ernest is your dad now'."

Bertha Giffrow testified: "Alice told us she would not let her children be taken away from her and adopted to some strang-

ers where she could never see them again. She would either take their lives and hers too if she had to give them up. I believed she might carry out her threat. My husband, Alice and I had a conversation following which we went to Le Mars to talk with our attorney, Mr. Roseberry.

"When we went to Le Mars, we left the children with my husband's cousin, and they weren't at the farm when we returned. We asked Mr. Roseberry if there was any custody papers we could take out to protect the children for Alice until she could take them back. He said no, if the authorities in Sioux City were investigating the case, we had better adopt them; that would be the only way we could keep them together, so that is what we did. Alice Pasley, the children's mother, inquired of attorney Roseberry, if it was possible, as soon as she was able to take the children back, could she cancel the adoption so that she could have them back and he, the attorney, told us that since it was between brother and sister she could. We could give them back to her. We never had any idea that we would have them for all the time. We hoped she would take them back. *I explained that they would be the same as our children, but we had hopes Alice would take them back* * * *

"Amanda Giffrow did not come back to the farm with us the day we adopted the children. We promised Alice we would not say anything about the adoption so when she took her children back, no one need know she had given them away. * * *

"From May 1927, to September 1928, Amanda Giffrow and her husband came to our place once a week or sometimes twice a week. During that time, she did not say anything to me about having adopted the children. From 1929 on, she more or less lived between our place and her daughter's place. It usually was from about the first of October to about the first of May. She never indicated that she knew the three children were adopted. I never told her children they were adopted. I only explained to them when we came home from Le Mars that they didn't have to worry any more; that they could stay with us and we would take care of them."

She also testified Kelly had worked at the farm on several

occasions but that he did not live or work there during 1927 and 1928.

On cross-examination she testified: "After the children came to live with us, they took the name of Giffrow so there wouldn't be no confusion in school and, from the time of the adoption, they were known as Giffrow children. * * *

"My two natural-born daughters are defendants in this case, and I am interested in this matter on their behalf. I feel that Frank and Dolly will inherit their share from their mother's farm and I feel my children should have their father's share. I think that is fair. We have done enough for them children, raising them and even keeping them after they were married, and for their families at times. I am partial to my own two children; I think I should be."

On redirect she testified, "We kept our promise to Alice that we would not say anything about the adoption."

Mrs. Mamie Lorensen, sister of Bertha Giffrow, who lived on a farm near the Giffrows from 1925 to 1928, testified she had never been told the three children were adopted by Ernest and that during her visits with Amanda she never indicated she (Amanda) knew they were adopted. She also testified she visited Amanda during 1931 to 1935 and the subject of adoption of the three children was never mentioned.

Mrs. Amanda Beers testified: "I am Amanda Giffrow's granddaughter. She spoke most often in German. I was with her quite a bit during her last illness, just before her death. On occasions, I discussed family affairs with her. She told me, 'When I am gone, you're going to know who is my favorite. I am going to give you the 80. I am going to give Alice (Pasley) 160, and when she is gone, it is to go back to her three children, Dolly, Helen and Frank, because Ernest is just giving them a home.' Then she said, 'I'm going to give Ernest 160. He has this one little girl and Les, by a former marriage'."

Mrs. Beers also stated she did not know about the adoption until this action was commenced.

We have attempted to set out only part of the testimony of each witness. Additional details would unduly lengthen this opinion. We, like the trial court, conclude the evidence fails to

establish Amanda Giffrow knew of the adoption either before or after the execution of her will. No intention to include plaintiffs as "children" of Ernest under paragraph five of the will is indicated.

These facts under the general rule and particularly our holding in Mesecher v. Leir, supra, defeat plaintiffs' claim.

Other issues raised by defendants' answer were only commented upon by the trial court. Under our holding it is unnecessary to discuss them.

The decree of the trial court is correct.—Affirmed.

All JUSTICES concur.